# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-2482

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the Western |
| v. | * | District of Missouri. |
| | * | |
| Michael P. Hollingsworth, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: January 9, 2001

Filed: July 30, 2001

_____

Before BEAM and MORRIS SHEPPARD ARNOLD, Circuit Judges, and ALSOP,[1]
District Judge.

_____

BEAM, Circuit Judge.

Appellant, Michael Hollingsworth, was convicted of three counts of attempting to manufacture methamphetamine in violation of 21 U.S.C. §§ 841 and 846 and was sentenced to thirty-two years in prison. Hollingsworth appeals both his conviction and his sentence on various grounds. He argues that his conviction violates Apprendi v. New Jersey because the jury did not make findings regarding drug amounts for which

_____

[1]The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota, sitting by designation.

he was responsible. He asserts that the sentencing judge made errors in assigning points for prior convictions and in applying sentencing enhancements for obstruction of justice and possession of a firearm. He also argues that the trial court erred by not granting his motion for a directed verdict of acquittal because the evidence did not establish that a substantial step had been taken towards manufacturing meth. We affirm in part and remand to the district court to consider whether consecutive sentences are appropriate.

## I. BACKGROUND

A three-count indictment originated from the appellant's activities on three separate occasions. We recount each incident in turn and view the facts most favorably to the jury verdict.

### A. Count I

On October 7, 1997, the appellant, using the name Michael Johnson, purchased twenty pounds of iodine crystals from an animal clinic in Holden, Missouri. In addition to a few legitimate veterinary uses, iodine crystals are one of three key ingredients necessary to manufacture methamphetamine (meth) employing the ephedrine reduction method.[2] It is not illegal to buy, sell, or purchase iodine. However, because of its use in producing meth, law enforcement officers often monitor purchases of iodine and

---

[2]The other key ingredients are phosphorous and pseudoephedrine (found in over-the-counter cold and flu medications). Through a number of chemical reactions, the pseudoephedrine is extracted from the binding material of the cold medicines, then chemically altered to become meth. Other chemicals are also employed at each stage of the reactions (including methanol, acetone, muriatic acid, lye, etc.), but iodine, phosphorous and pseudoephedrine are the key components necessary to the ephedrine reduction method.

were present when appellant made his purchase at the animal clinic. Appellant paid for the iodine with cash, and a check drawn on a credit card account in his father's name.

Appellant had previously inquired about purchasing iodine, and had purchased one pound of iodine in September 1997. He claims that he sought to purchase only one pound of iodine on October 7, but was told by clinic employees that the iodine could only be purchased in twenty-pound quantities. However, clinic employees denied this during their testimony.

After following the appellant from the clinic for two hours, the police stopped him because the surveillance helicopter was running low on fuel and they feared he had spotted them. In addition to the twenty pounds of iodine, police found drug paraphernalia in appellant's car, but none of the other component chemicals or equipment necessary to manufacture meth.

Police also responded to the address displayed on the check appellant had used for the purchase. Appellant's parents owned the house and lived in its upstairs portion while appellant resided in the basement. After receiving consent to search the house, officers searched the basement, which included the garage. They found a non-operational meth laboratory. Among the items recovered were Pyrex flasks and other scientific glassware, a condenser, plastic tubing, a hot plate, several gallons of acetone, methal ethyl ketone, several gallons of Coleman fuel, Red Devil Lye, a plastic bag with red residue, glass tubing with black residue,[3] triple beam scales, a plastic baggy containing a trace amount of white residue which tested positive for ephedrine, a jar containing waste product consistent with meth production and a briefcase with a variety of over-the-counter cold medications . Individually, these items are not illegal to

---

[3]This red and black residue is consistent with several different stages of the meth production process.

possess, but together they comprise the elements necessary to produce meth. The officers confiscated all of the items.

The government prepared a production capability report based upon the above listed chemicals and equipment. It concluded that from the twenty pounds of iodine, the appellant could ultimately produce between 1.3 to 1.8 kilograms of meth, assuming the presence of phosphorous and pseudoephedrine in sufficient quantities, and a sixty to eighty percent yield. The Presentence Report (PSR) used the 1.3 kilogram amount in its recommendations to the court because that amount was more advantageous to the appellant. Appellant's expert conceded at the sentencing hearing, that if one calculated drug quantities based on the most abundant precursor chemical, the government capability estimate was reasonable.

## B.    Count II

Responding to an explosion and fire on January 8, 1998, authorities found another meth laboratory in the basement of appellant's parents' house. Two city maintenance employees contacted the police and stated they observed smoke coming from the house and two white males run from the rear of the residence to enter a house nearby. A neighbor, who identified one of the men she saw as the appellant, corroborated this account.

Officers contacted Linda Hollingsworth, the appellant's estranged wife, who resided at the nearby house. Ms. Hollingsworth initially denied that anyone had entered her house, and refused to consent to a search of the premises. However, after police took a statement from the neighbor, and after Darrell Wilson (ultimately a codefendant of appellant) exited Ms. Hollingsworth's house and was identified by the two city workers as one of the men they saw flee from appellant's parents' house, Ms. Hollingsworth gave consent to search her home. Officers found the appellant, whom they took into custody and later released pending further investigation.

Officers recovered even more items related to meth production than they had on October 7, 1997. In addition to similar scientific glassware, plastic tubing, coffee filters,[4] and gram scales, the officers also confiscated several gallons of various liquids and sediments consistent with waste product associated with meth production, 200 empty bottles of Heet brand antifreeze for fuel,[5] camp fuel containers (both full and empty), lye, several gallons of acetone, hydrochloric acid, and sixty-eight empty bottles of pseudoephedrine tablets. The officers also discovered a semi-automatic pistol in appellant's jeep, which was parked in the garage near the meth lab.

Based on the amount of pseudoephedrine that had been contained in fifty-nine of the empty pseudoephedrine bottles, the government produced a production capability report estimating the appellant could have manufactured 265 grams of meth.

## C.    Count III

On January 26, 1999, authorities stopped the appellant for traffic violations. Because he gave false information about his identity and seemed nervous, officers asked for, and received permission to search his vehicle, where they found many materials consistent with a meth laboratory. After a brief struggle, appellant was arrested. Officers again searched the basement at his parents' house and found additional items consistent with the manufacture of meth. They then learned the appellant had likely been headed to another property owned by his parents and they obtained consent to search that property, turning up more chemicals and glassware consistent with meth production.

---

[4]Many of these items either had white residue, red residue or stains, or black residue or stains.

[5]Heet, which is primarily methanol, can be used at various stages in the production process to help separate pseudoephedrine from the binding material in cold pills, and to speed the evaporation of chemical mixtures.

The sentencing judge did not rely on the potential drug amounts from this count in determining the appellant's sentence.

## D.    Trial

At trial, the appellant was convicted of all three counts. Counts I and II of the indictment alleged an attempt to manufacture 100 grams or more of meth in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. Count III alleged attempt to manufacture meth in an amount exceeding five grams, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846. No count attributed a specific drug quantity to the appellant. At trial, the court denied appellant's request for a jury instruction that would have required the jury to make a finding of a specific drug quantity for each count.

The appellant chose to testify at his trial. He admitted using meth, but claimed he had never been involved in the manufacture of meth. He explained the large amount of glassware in his home and vehicle (scientific and otherwise) by asserting that he was a collector of unique glassware. He asserted that his codefendant, Darrell Wilson, had planted all of the meth items related to Count II in his house. He acknowledged buying twenty pounds of iodine but said he was going to use it for a horseshoing class he planned to take. Last, he explained the meth-related items found in his truck in January 1999 were all in a garbage bag belonging to someone else, although he failed to explain how it came to be in his truck.

The government presented witnesses who testified they had seen the appellant cook meth in the past.[6] They also testified that he was known as the "cook doctor," as the person to go to if you needed to save a batch of meth that was going bad.

---

[6]The process of producing meth is referred to as "cooking" and those individuals who do it are often called "cooks."

-6-

## II.    ANALYSIS

### A.    Apprendi

In Apprendi v. New Jersey, 120 S. Ct. 2348 (2000), the Supreme Court held that any fact, other than the fact of a previous conviction, which will increase a sentence beyond the prescribed statutory maximum must be submitted to the jury and proved beyond a reasonable doubt. Id. at 2362-63. Applying Apprendi to drug convictions under 21 U.S.C. § 841, we have held that "drug quantity must often be treated as an element of the offense under § 841" and thus, must be submitted to a jury to be proved beyond a reasonable doubt. United States v. Sheppard, 219 F.3d 766, 767 (8th Cir. 2000).

The penalty scheme of 21 U.S.C. § 841(b)(1) contemplates three potential sentencing ranges for manufacturing meth, according to the drug quantity involved.[7] Section 841(b)(1)(A) prescribes a statutory maximum of life in prison if the offense involves fifty grams or more of meth. Section 841(b)(1)(B) imposes a statutory maximum sentence of forty years for offenses involving five grams or more of meth. Section 841(b)(1)(C) limits the maximum sentence to twenty years if no specific drug quantity is determined. The government conceded at oral argument, and we agree, that an Apprendi violation occurred because the appellant was sentenced to a term of thirty-two years, a sentence which exceeds the statutory maximum allowed by 841(b)(1)(C) for meth offenses without a specified drug quantity. See United States v. Aguayo-Delgado, 220 F.3d 926, 933 (8th Cir. 2000).[8]

---

[7]21 U.S.C. § 846 makes it a crime to attempt to manufacture meth. The penalty for attempt is determined according to the scheme in 21 U.S.C. § 841(b)(1) and the sentencing guidelines.

[8]The appellant argues that the Apprendi violation should be remedied by a new trial. Because the jury properly convicted appellant of attempt to manufacture meth

Relying on <u>Neder v. United States</u>, 527 U.S. 1 (1998), the government argues that any error is harmless. In <u>Neder</u>, the Supreme Court held that harmless error analysis pursuant to Federal Rule of Criminal Procedure 52(a) applied where a court gave the jury an instruction omitting an element of the charged offense. 527 U.S. at 15. The Court held that an appellate court may find the error harmless if, after a thorough review of the record, it cannot find any evidence that "could rationally lead to a contrary finding with respect to the omitted element." <u>Id.</u> at 19. The Court concluded that because in that case the evidence concerning the omitted element was overwhelming *and* uncontroverted, no jury could have rationally found for the defendant. <u>Id.</u> at 17.

The government argues that the drug quantities were uncontested here because the amount of precursor chemicals upon which they were based was not contested and appellant's expert only disputed the drug quantities by asserting the calculations should have been based upon the least abundant precursor chemical appellant possessed rather than the most abundant precursor chemical. Appellant's expert conceded that if the most abundant precursor chemical was used in the calculations, then the government's estimates of drug quantity, which the sentencing court relied upon, were reasonable.

The government is correct that a sentencing court *may* make drug quantity calculations based upon the most abundant precursor chemical present. <u>United States v. Funk</u>, 985 F.2d 391, 393 (8th Cir. 1993). However, this is just one of a number of options available to a sentencing judge. Drug quantity calculations are "a fact intensive inquiry that should not be constricted by an inflexible rule as to one relevant factor."[9]

---

with an unspecified amount, the error would only affect the length of sentence and a new trial is not warranted. <u>See</u> <u>United States v. Ray</u>, 250 F.3d 596, 602 (8th Cir. 2001).

[9]When the element not submitted to the jury in violation of <u>Apprendi</u> involves calculating drug quantity, the harmless error inquiry is highly fact specific. <u>Compare</u>

Id. Therefore, whether it is appropriate to base the calculation on the most abundant precursor chemical–or the least abundant or something in between–is an inquiry dependent upon the facts of the case as a whole. Where that drug amount calculation will increase the sentence above the statutory maximum, Apprendi mandates that it is for the jury to weigh the facts and make the initial determination of a drug quantity range, and in doing so the jury is not bound by any single "inflexible rule." Thus, in this case contesting the method of calculation was sufficient to controvert the element of drug quantity for purposes of the Neder harmless error analysis.

Further, the appellant has contested much of the underlying evidence a fact finder would examine in determining whether to base drug quantity calculations upon the most or least abundant precursor chemical. He points out that no operational lab was found, he was never found with significant quantities of more than one precursor chemical at any one time, he contested the evidence of his possession of some of the precursor chemicals, and he argued that he intended to give some of the chemicals to others rather than use them to manufacture meth himself. Cf. United States v. Nordby, 225 F.3d 1053, 1060-61 (9th Cir. 2000) (finding that where defendant admitted to growing some marijuana on his land, and admitted to a past conspiracy to grow marijuana, but offered evidence that he was not responsible for all the marijuana plants found on his land

---

United States v. Butler, 238 F.3d 1001 (8th Cir. 2001) (finding plain error in failure to submit drug quantity to jury where defendant was stopped with 1000 pounds of substance that was apparently marijuana, defendant stipulated it was marijuana and lab tests of random samples indicated it was marijuana but did not contain total quantity report), with United States v. Anderson, 236 F.3d 427 (8th Cir. 2001) (finding harmless error where drug quantity was not submitted to jury, but it was uncontested that defendants possessed sufficient quantities of all meth precursor chemicals to make at least 100 grams of meth). In Butler the appellant failed to object at trial to the court's failure to submit drug quantity to the jury, so his claim was reviewed for plain error. Other than differences in the burden of persuasion, the harmless error and plain error inquiries are substantially similar. See United States v. Olano, 507 U.S. 725, 734 (1993).

relevant to his current charged offense, failure to submit drug quantity to the jury was not harmless error). We believe this evidence could lead a rational jury to conclude appellant was guilty of attempt but that he was only responsible for less than five grams of meth, even if such a result seems unlikely.[10]  However, unlikely does not equal irrational. To find harmless error in this case would move us a step closer to a result that the Court explicitly rejected in <u>Neder</u> –allowing a directed verdict against a defendant in a criminal case.  <u>See</u> 527 U.S. at 17 n.2.

We do not mean to imply that because the evidence was contested in this case it would be improper to base the production capability on the most abundant precursor. Where the quantity calculation will potentially increase the sentence above the statutory maximum, the quantity question–including the propriety of basing the quantity calculation on the most or least abundant precursor chemicals– must initially be submitted to the jury.  The jury need not make an exact drug quantity finding to satisfy <u>Apprendi</u>.  It need only make findings regarding ranges of quantities relevant to the varying statutory maximums under 21 U.S.C. § 841 (<u>e.g.</u>, five grams or more or fifty grams or more).  It would still be proper for the sentencing judge to then make more exact calculations for purposes of computing the offense level under the guidelines and determining where the sentence will actually fall within the statutory range determined by the jury's verdict.

---

[10]The government argues that our decision in <u>Anderson</u> should control this case. In <u>Anderson</u>, the amount of chemicals upon which the drug quantity calculations were based were functionally uncontested because defendants had been in possession of all of the necessary precursor chemicals. The court rejected an assertion that the production capacity had to be based on the least abundant precursor chemical and concluded that no jury could logically have found the defendants guilty of conspiracy to manufacture meth, but in an amount less than five grams.  236 F.3d at 430. However, unlike <u>Anderson</u>, in the present case there was no evidence, uncontested or otherwise, that appellant had possessed sufficient quantities of all necessary precursors.

The government's argument that any sentencing error is harmless because the judge could have issued consecutive sentences on each of the three counts to achieve a thirty-two year sentence without exceeding the statutory maximum sentence on any one count has more merit. We have recently considered this question in a number of cases, see, e.g., United States v. Bradford, 246 F.3d 1107, 1113-15 (8th Cir.2001) (examining the appropriateness of harmless error analysis in the context of consecutive sentences). Although in some circumstances the record may be so clear that we may be able to recalculate the appellants' sentences ourselves, United States v. Sturgis, 238 F.3d 956 (8th Cir. 2001), normally the most prudent course is to remand to the district court, which is generally much more familiar with the specific facts and details of a case, to apply the rather idiosyncratic guidelines pertaining to consecutive sentences. See Bradford, 246 F.3d at 1113-14. Additionally, a district court holds fairly broad discretion to impose concurrent or consecutive sentences, and may even depart from the guidelines scheme in appropriate circumstances. Id. See also United States v. Quinones, 26 F.3d 213, 219 (1st Cir. 1994). Thus, only in cases of overwhelming evidence against the defendant, or where the intent of the district court is manifestly clear will we engage in our own analysis and application of the guidelines to determine the appropriateness of consecutive versus concurrent sentences. We remand to the district court to determine whether it is appropriate in this case to impose consecutive or concurrent sentences on these counts under the guidelines and the above cases.

## B.    Sufficiency of the Evidence

Appellant argues that the district court erred in failing to grant a motion of acquittal at the close of the government's case because there was insufficient evidence to support a finding of attempt.

Our scope of review on a sufficiency of the evidence challenge is very narrow. We will reverse a denial of a motion for acquittal only if, after viewing the evidence in the light most favorable to the jury's verdict, giving the government the benefit of all

reasonable inferences that may be drawn from the evidence, no construction of the evidence will support the jury's verdict. United States v. Cunningham, 83 F.3d 218, 222 (8th Cir. 1996). To demonstrate attempt to manufacture meth, the government must show appellant's criminal intent and conduct that constitutes a substantial step towards manufacturing meth United States v. Montanye, 996 F.2d 190, 191 (8th Cir. 1993).

Appellant argues that purchasing a precursor chemical (iodine) alone is insufficient to constitute a substantial step and that the government did not establish that appellant was in control of, or connected with, his parents' basement where the labs were found. There was ample evidence that appellant was attempting to manufacture meth with relation to each count. From his conduct in ordering the iodine under an assumed name, to the presence of the lab equipment at his residence (including presence of extracted pseudoephedrine and other waste products consistent with producing meth), to the testimony of his codefendant linking him to the manufacture of meth, the jury was presented with sufficient evidence to support the conclusion that appellant took a substantial step toward manufacturing meth.[11] Cf. United States v. Mazzella, 768 F.2d 235, 240 (8th Cir. 1985) (finding the acts of ordering, receiving and possessing the specific chemicals and equipment necessary to manufacture meth are conduct sufficient to support a finding that a substantial step occurred).

That other individuals may have had access to the basement where the appellant lived when each lab was found, and that appellant was stopped before reaching his residence with the iodine (in Count I), do not lead to the conclusion that no rational jury could have found a sufficient connection between appellant and the meth labs to infer a substantial step. Rather, they are merely bits of evidence that tend to exculpate the

_____

[11]For the same reason, we reject appellant's additional argument that the facts relating to Count I only support conviction for possessing a precursor chemical.

appellant, which the jury presumably weighed against the facts that tended to inculpate the appellant. We are not at liberty to re-weigh these facts on appeal.

### C.    Sentencing Hearing

Appellant asserts that the district court erred in making its drug calculations, in assessing points for his criminal history, in assessing points for obstruction of justice and in assessing points for possessing a dangerous weapon.

Appellant's sole challenge to the drug amounts attributed to him is that the district court improperly relied upon the most abundant precursor chemical in its drug capability calculations. We have already addressed this issue in our discussion of Apprendi.

Appellant's objections to the assignment of criminal history points for his past convictions are wholly without merit. He relies entirely on quotes from the guidelines taken out of context, attempts to apply incorrect guidelines, and/or gross misreadings of the guidelines provisions. As such, they merit no further comment.

We review for clear error a district court's enhancement for obstruction of justice. United States v. Hunt, 171 F.3d 1192, 1196 (8th Cir. 1999). Appellant is correct that section 3C1.1 of the guidelines is not intended to punish defendants for exercising their constitutional rights and/or denying their guilt. U.S.S.G. § 3C1.1 cmt. 2 (1997). However, "[a] defendant is subject to an obstruction enhancement under U.S.S.G. § 3C1.1 if he testifies falsely under oath in regard to a material matter and does so willfully rather than out of confusion or mistake." United States v. Chadwick, 44 F.3d 713, 715 (8th Cir. 1995). The appellant voluntarily testified under oath that he was not involved in the manufacture of meth. The jury was presented with evidence directly contradictory to appellant's testimony, including testimony from other witnesses who said they had been present when the appellant manufactured meth. Given this

-13-

conflicting testimony, and the ample circumstantial evidence against the appellant, the jury found him guilty on all counts of attempt to manufacture meth. The sentencing judge also observed all of the evidence and testimony first-hand as the presiding judge at trial. Under these facts, it was not clear error for the sentencing judge to assign the obstruction of justice enhancement for appellant's "denial of guilt under oath that constitutes perjury." U.S.S.G. § 3C1.1 cmt. 2.

We also review for clear error the district court's application of an enhancement for possession of a dangerous weapon in connection to a drug crime. United States v. Betz, 82 F.3d 205, 210 (8th Cir. 1996). The gun was found in appellant's vehicle, located in the garage joined to the basement. The meth lab was found in the basement and garage area. The adjustment for possession of a weapon should be applied "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1) cmt. 3. We have upheld application of this enhancement on facts illustrating less of a connection between a weapon and illicit drugs than exists here. See Betz, 82 F.3d at 210-11 (enhancement was proper where firearms were found on defendant's property where drug-related activity had occurred, but not in same shed as drugs); United States v. Hiveley, 61 F.3d 1358, 1362 (8th Cir. 1995) (same). There is no support for appellant's contention that application of this enhancement requires a jury finding concerning possession of the firearm. Thus, the district court was not clearly erroneous in applying the two-level enhancement pursuant to U.S.S.G.§ 2D1.1(b)(1).

## III.   CONCLUSION

We reverse and remand to the district court to consider whether consecutive or concurrent sentences may be appropriate. The rule of Apprendi limits appellant's potential sentence to a maximum of twenty years pursuant to 21 U.S.C. § 841(b)(1)(C) for each count of conviction. If the court finds that under the guidelines only

-14-

concurrent sentences are proper, then appellant's sentence would be limited to twenty years total.  We affirm the district court in all other respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.